FILED

2018 FEB 14 PM 3:58

CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **INDICTMENT** |
| Plaintiff, | ) | |
| | ) | 1:18 CR 76 |
| v. | ) | CASE NO.: _____ |
| | ) | Title 18, Section 286, United States Code |
| MUHAMMAD HAGUE, | ) | |
| RICHARD A. WARREN, | ) | |
| Defendants. | ) | |

JUDGE POLSTER

**General Allegations**

At all times relevant to this Indictment, unless otherwise specified:

1.  Defendant RICHARD A. WARREN ("WARREN") was a resident of Philadelphia, Pennsylvania.

2.  Defendant MUHAMMAD HAGUE ("HAGUE") was a resident of Avon, Ohio.

3.  M.H. was a resident of Cleveland, Ohio, or Shaker Heights, Ohio.

4.  M.H. was HAGUE's sister. M.H. was in the business of preparing income tax returns. On or about February 4, 2009, M.H. formed Hague United Services ("Hague United") for the purpose of operating a tax preparation business. M.H. operated Hague United out of her residences in Cleveland, Ohio, and Shaker Heights, Ohio.

5.  HAGUE was also in the business of preparing income tax returns. On or about December 1, 2011, HAGUE formed Hague Financial Services ("Hague Financial") in the State of Ohio for the purpose of operating a tax preparation business.

6.  Natasha Johnson ("Johnson") worked with HAGUE at the City of Cleveland Water Department (the "Water Department"). In or around 2010, HAGUE recruited Johnson to work for Hague Financial while both she and HAGUE continued working for the Water Department. Johnson was a resident of Cleveland, Ohio.

7.  Sabrina Sorrell ("Sorrell") was a resident of Philadelphia, Pennsylvania. Sorrell was married to WARREN.

8.  Federal tax law for the years 2009 through 2012 provided for the following refundable tax credits that could be claimed by qualifying persons on their federal income tax returns:

   a.  The American Opportunity Credit ("AOC") was an education tax credit of up to $2,500 on the amount of qualified education expenses paid for a student to any college, university, vocational school, or other postsecondary educational institution eligible to participate in a student aid program administered by the U.S. Department of Education.

   b.  The Making Work Pay Credit ("MWP") was a tax credit during the 2009 and 2010 tax years for individuals who earned income from work and whose adjusted gross income was less than $95,000 ($190,000 if married filing jointly). The credit was a percentage of the income earned up to a maximum of $400 ($800 if married filing jointly).

   c.  The Earned Income Credit ("EIC") was a tax credit for certain low income working persons. In addition to other requirements, individuals without qualifying

children had to be between the ages of 25 and 65, not be claimed as a dependent on another return, and have an adjusted gross income less than the following to qualify: $13,440 ($18,440 if married filing jointly) for tax year 2009; $13,460 ($18,470 if married filing jointly) for tax year 2010; $13,660 ($18,470 if married filing jointly) for tax year 2011; and $13,980 ($19,190 if married filing jointly) for tax year 2012. The EIC could have resulted in a tax refund even if the taxpayer did not owe any tax.

d.      The Additional Child Tax Credit ("ACTC") was a refundable credit that could be claimed by taxpayers who were ineligible to claim the full non-refundable child tax credit because it exceeded their total tax liability. The ACTC could have resulted in a tax refund even if the taxpayer did not owe any tax.

9.      A tax return preparer was a person who completed and filed federal income tax returns on behalf of a taxpayer.

10.     A Preparer Tax Identification Number ("PTIN") was an identification number that all paid tax return preparers were required to use on U.S. federal tax returns or claims for refund submitted to the Internal Revenue Service ("IRS").

11.     An Electronic Filing Identification Number ("EFIN") was a number assigned by the IRS to tax preparers that were accepted into the IRS tax return electronic filing program ("e-file program"). To become an authorized IRS e-file provider, tax preparers were required to submit an application and undergo a screening process.

12.     IRS procedures allowed a tax preparer or taxpayer to request payment of a refund by direct deposit, split into as many as three different financial accounts (including debit card accounts). To request split deposits of a refund, the taxpayer listed the account number and routing number for each deposit on Form 8888 attached to the taxpayer's income tax return.

3

13. Turbo Tax and Free Tax were tax software programs available for use by taxpayers or professional tax preparers to prepare and electronically file income tax returns. The software programs enabled a taxpayer to receive a direct deposit refund payment directly into a bank account or onto a debit card.

## The Scheme to Defraud the United States

14. From approximately in or around January 2010 through in or around April 2013, M.H. and others engaged in a scheme to file federal income tax returns in the names of low income persons (hereinafter, the "claimants") that generated false and inflated tax refunds split typically between the claimants and the conspirators in the scheme. The conspirators used the claimants' personal identification information ("PII") to prepare and electronically file income tax returns in the claimants' names that falsely reported, among other things, unsubstantiated amounts of income, occupation information, educational expenses, and the number of qualifying dependents, which caused false claims for tax refunds to be filed and fraudulently inflated tax refunds to be paid.

    A.    **Hague United**

15. During the filing seasons for the 2009 through 2012 tax years, M.H. operated Hague United and held herself out as a paid tax return preparer. Through Hague United, M.H. prepared and filed federal income tax returns claiming false tax refunds on behalf of claimants based largely in the Cleveland, Ohio, and Philadelphia, Pennsylvania, areas.

16. M.H. recruited Sorrell and WARREN into the scheme in order to recruit claimants and obtain their PII to provide that information to M.H., who would, in turn, prepare and file the false income tax returns in the claimants' names. M.H. and Sorrell agreed that M.H.

would pay Sorrell and WARREN a $1,000 "referral fee" per claimant that Sorrell and WARREN recruited for the filing of a false tax return.

17. From approximately 2010 through 2013, in exchange for payments and promises of payments from M.H. (hereinafter, the "referral fees"), Sorrell and WARREN recruited claimants for M.H. to prepare income tax returns in claimants' names. Sorrell and WARREN gathered PII from claimants and their dependents, including names, addresses, social security numbers, dates of birth, and bank account information, and provided that information to M.H. to be used in preparation of false federal income tax returns. Sorrell and WARREN did not request, and otherwise rarely obtained, income or employment information from the claimants. Sorrell and WARREN typically recruited claimants from low-income neighborhoods in the Philadelphia, Pennsylvania, area.

18. Through e-mails and other means, Sorrell and WARREN forwarded the PII they collected to M.H. to use in preparing false tax returns. M.H. electronically filed the federal income tax returns from her homes in the Northern District of Ohio, Eastern Division. M.H. had little, if any, contact with the claimants Sorrell and WARREN recruited. M.H. also rarely, if ever, had information regarding claimants' actual employment, income, or education expenses, if any.

19. M.H. filed the federal income tax returns claiming false tax refunds on behalf of the claimants and directed portions of the refunds into bank accounts controlled by M.H., Sorrell, and WARREN. Sorrell and WARREN established and maintained business bank accounts in the name of shell companies in order to receive their referral fees, which were paid out of portions of the claimants' tax refunds.

20. At times, M.H. wrote checks to Sorrell to pay Sorrell and WARREN's referral fees. M.H. would make false notations on the memo line of the checks in an effort to conceal the true nature of the payments.

### B. Hague Financial

21. In or around January 2011, M.H. recruited her brother, HAGUE, into the scheme to defraud the United States. Among other things, HAGUE recruited claimants and obtained their PII and provided that information to M.H., who would then prepare and file the false income tax returns in the claimants' names.

22. M.H. eventually taught HAGUE how to prepare and file false income tax returns in order to defraud the United States.

23. From approximately in or around January 2011 through in or around April 2013, HAGUE, Johnson, and others operated Hague Financial, which held itself out as a paid tax return preparation business. At times, HAGUE, Johnson, and others conducted Hague Financial's business out of the Water Department during normal business hours. HAGUE oversaw the operations of Hague Financial, and, among other things, answered telephone calls for Hague Financial, recruited tax claimants through door-to-door and other marketing, and prepared income tax returns for individual tax claimants.

24. In or around January 2011, HAGUE recruited Johnson to work at Hague Financial. When Johnson began working for Hague Financial, she was primarily responsible for answering telephone calls, recruiting tax claimants through door-to-door and other marketing, and collecting PII from claimants, which she forwarded to HAGUE and M.H. for preparation of individual tax returns. Beginning in approximately August 2011, HAGUE taught Johnson how

6

to file false income tax returns. Thereafter, Johnson also began to prepare income tax returns for claimants.

25. HAGUE, Johnson, and others publicly promoted Hague Financial's services through paper flyers and other advertising, word-of-mouth referrals, and door-to-door solicitation. They focused their recruiting and advertising in lower-income neighborhoods in the greater Cleveland, Ohio, area, including in homeless shelters.

26. From approximately in or around January 2011 through in or around April 2013, HAGUE, Johnson, and others recruited claimants to have income tax returns prepared in their names. HAGUE, Johnson, and others gathered PII from claimants and their dependents, including names, addresses, social security numbers, dates of birth, and bank account information, and used that information to prepare false federal income tax returns. HAGUE and Johnson generally did not request, and otherwise rarely obtained, income or employment information from the claimants. In some instances, HAGUE and Johnson intentionally instructed claimants on the amounts of income, educational expenses, or qualifying dependents to be reported in order to increase false tax refunds, without any substantiation or regard for the truth of the information.

27. Based on the information HAGUE, Johnson and others collected, M.H., HAGUE, and Johnson electronically filed federal income tax returns, from the Northern District of Ohio, Eastern Division, claiming false tax refunds on behalf of the claimants. M.H., HAGUE, and Johnson directed portions of the tax refunds into bank accounts they controlled. Beginning in the 2012 tax filing season, HAGUE and Johnson generally directed the entire refund amount to the claimant and typically charged the claimant a return preparation fee of $1,500.

### C. The False Tax Returns

28. A large majority of the tax returns the conspirators prepared and filed reported false information and claimed false or inflated tax refunds, among other ways, as follows:

   a. The returns reported falsified occupations and amounts of income, often reported as "household help" or "HSH" income, with no corresponding withholding or supporting W-2 or 1099 forms.

   b. The falsified income was generally in a range of between approximately $9,000 and $18,000 for head of household filers and between approximately $5,000 and $16,000 for single filers.

   c. Most of the returns falsely reported the same unverifiable occupations, including caregiver, lawn care, tutor, child care, and self-employed.

   d. For claimants between the ages of 25 and 65, the returns generally reported false income and dependents to qualify the claimant for a maximum or near-maximum EIC, often as much as $6,000.

   e. Based on the false income and dependent information, the returns often claimed an ACTC of up to $3,000.

   f. Based on the falsely reported income and educational expenses (often reported in the maximum amount of $4,000), approximately 40% of the returns claimed an AOC of $1,000.

   g. Based on the falsely reported income, many of the returns claimed the maximum MWP Credit in the amount of $400 during the 2009 and 2010 tax years.

29. The majority of the prepared returns directed a portion of the refund proceeds to the individual claimants either directly into their bank account or onto a debit card, with the

remaining portion of the refund proceeds being directed to bank accounts controlled by the conspirators. In some instances, claimants received less than half of the false refund amounts claimed on their returns. The portion of the refund directed to the conspirators often exceeded the tax return preparation fee quoted to the claimants.

## COUNT 1
### (Conspiracy to Make False Claims, 18 U.S.C. § 286)

The Grand Jury charges:

30. Paragraphs 1 through 29 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

31. From approximately in or around January 2010 through in or around April 2013, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio, Eastern Division, and elsewhere, Defendants MUHAMMAD HAGUE and RICHARD A. WARREN, and others known and unknown to the Grand Jury, did knowingly and voluntarily combine, conspire, confederate, and agree together and with each other to defraud the United States by obtaining and aiding to obtain the payment and allowance of false, fictitious, and fraudulent claims, in violation of Title 18, United States Code, Section 286.

## OBJECTS OF THE CONSPIRACY

32. The objects of the conspiracy were to: (a) defraud the United States; (b) file false income tax returns in the names of various individual taxpayers seeking false refund claims; and (c) obtain portions of the refunds for the conspirators' personal use and enrichment.

## MANNER AND MEANS OF THE CONSPIRACY

33. The manner and means by which the conspiracy was carried out, in the Northern District of Ohio, Eastern Division, and elsewhere, included, but were not limited to, the following:

a. The conspirators prepared and filed and caused to be filed false federal income tax returns in the names of low-income claimants that generated false tax refunds.

b. The conspirators recruited claimants and obtained their PII, but generally not income and employment information, and provided that information to other conspirators who would then prepare and file false income tax returns claiming false tax refunds in the name of the claimants.

c. The conspirators used the claimants' PII to prepare and electronically file income tax returns in the claimants' names that falsely reported, among other things, false and unsubstantiated amounts of income, occupation information, and educational expenses, giving rise to false claims for tax refunds.

d. The conspirators held themselves out as legitimate paid tax preparers, when in truth they were not.

e. The conspirators marketed their tax preparation services through paper flyers and other advertising, word-of-mouth referrals, and door-to-door solicitation, focusing on lower-income neighborhoods, including homeless shelters, in the greater Cleveland, Ohio, and Philadelphia, Pennsylvania, areas.

f. The conspirators established and maintained business bank accounts in company names in order to receive referral fees for recruiting claimants, which referral fees were paid out of portions of the claimants' tax refunds.

      g.      The conspirators typically split the fraudulent tax refund proceeds with the claimant, often by directing a portion of the refund to a bank account or other direct deposit account controlled by the claimant and directing the remaining portion of the false tax refunds into bank accounts controlled by the conspirators for their personal use and enrichment.

All in violation of Title 18, United States Code, Section 286.

                                    A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.